UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil Action No. 05-61672-CIV-ALTONAGA/TURNOFF

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

v.

MADISON FOREX INTERNATIONAL, LLC,
CHADWICK GRAYSON BAUER & CO., INC.,
QUALIFIED LEVERAGE PROVIDERS, INC.,
JOHN PETER D'ONOFRIO, CHRISTOPHER PECK,
GARY BAUGH, AND LEA LAUREN,

Defendants.        /

## CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF AGAINST MADISON FOREX INTERNATIONAL, LLC, CHADWICK GRAYSON BAUER & CO, INC., AND QUALIFIED LEVERAGE PROVIDERS, INC.

## I.      INTRODUCTION

On October 18, 2005, Plaintiff, Commodity Futures Trading Commission

("Commission"), filed a Complaint, seeking injunctive and other equitable relief, as well as the

imposition of civil penalties, charging defendants Madison Forex International, LLC

("Madison"), Chadwick Grayson Bauer & Co., Inc. ("Chadwick"), and Qualified Leverage

Providers, Inc. ("QLP"), (collectively the "Settling Defendants"), and John Peter D'Onofrio

("D'Onofrio"), Christopher Peck ("Peck"), Lea Lauren ("Lauren") and Gary Baugh ("Baugh"),

with violating Sections 4c(b) of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C.

§ 6c(b) (2002), and Commission Regulation 32.9 (a) and (c), 17 C.F.R. § 32.9 (a) and (c) (2004),

as well as other sections of the Act, by fraudulently soliciting more than $ 4.5 million from

public customers to trade foreign currency options, as well as other things.

On October 18, 2005, the Court entered an ex parte Statutory Restraining Order against the Settling Defendants, and others. Thereafter, on November 30, 2005, the Court entered an Agreed Order of Preliminary Injunction and Other Ancillary Relief against the Settling Defendants, and modified that order on September 11, 2006.

## II. CONSENTS AND AGREEMENTS

1.      Solely to effect settlement of the matters alleged in the Complaint in this action, without a trial on the merits, any further judicial proceedings or presentation of any evidence, the Settling Defendants, individually and collectively:

      a.     Consent to the entry of this Consent Order of Permanent Injunction and Other Equitable Relief ("Consent Order");

      b.     Affirm that they have read and agreed to this Consent Order voluntarily, and that no threat or promise has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

      c.     Acknowledge service of the Summons and Complaint;

      d.     Admit that this Court has jurisdiction over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

      e.     Admit that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U,S.C. § 13a-1;

      f.     Waive:

            (1)     All claims which may be available under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412, relating to, or

2

arising from, this action and any right under EAJA to seek costs, fees and other expenses relating to, or arising from, this action;

(2)    any claim of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any relief; and

(3)    all rights of appeal from this Consent Order;

g.    Consent to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Consent Order and for any other purposes relevant to this case, even if they now or in the future reside outside the jurisdiction; and

h.    Agree that neither Settling Defendants, nor any of their agents, employees or representatives acting under its control, shall take any action or make any public statement denying, directly or indirectly, any allegations in the Complaint or stipulations in this Consent Order, or creating or tending to create the impression that the Complaint and this Consent Order are without factual basis; provided, however, that nothing in this provision shall affect Settling Defendants': i) testimonial obligations, or ii) right to take legal positions in other proceedings to which the Commission is not a party. Settling Defendants will undertake all steps necessary to assure that their agents, employees and representatives understand and comply with this agreement;

2.    By consenting to the entry of this Consent Order, Settling Defendants neither admit nor deny the allegations of the Complaint or Findings of Facts and

Conclusions of Law contained in this Consent Order, except as to jurisdiction and venue, which they admit. However, Settling Defendants agree, and the parties to this Consent Order intend, that the allegations of the First Amended Complaint and the Findings of Fact made by this Court shall be taken as true and correct and given preclusive effect, without further proof, in any proceeding in bankruptcy or any proceeding to enforce the terms of this Consent Order. Settling Defendants shall provide immediate notice to this Court and the Commission via certified mail, of any bankruptcy filed by, on behalf of, or against them, and shall provide immediate notice of any change of address, phone number, or contact information.

3.     Settling Defendants agree to cooperate with the Commission staff in the continuing litigation of this matter against any and all defendants not party to this Consent Order. As part of such cooperation, Settling Defendants agree, subject to all applicable privileges, to comply fully, promptly and truthfully to any inquiries or requests for information or testimony, including but not limited to testifying completely and truthfully in this action and producing statements or declarations to the Commission related to any trial of the subject matter in this proceeding;

4.     This Consent Order shall not bind any party who is not a signatory hereto.

### III.FINDINGS OF FACTS

5.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court directs the entry of the Findings of Facts and Conclusions of Law and a permanent injunction and equitable relief, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

The Court makes the following findings of facts:

## A.    The Parties

6.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.*

7.    Defendant **Madison Forex International, LLC** is a Florida limited liability company that had its principal place of business at 3101 N. Federal Highway, Suite 400, Ft. Lauderdale, Florida 33306.  Although Madison had an application for registration as an introducing broker ("IB") pending in November 2003, it has never been registered with the Commission in any capacity.  Madison was organized as a Florida limited liability company on October 16, 2003.

8.    Defendant **Chadwick Grayson Bauer & Co., Inc.** is a Florida corporation that had its principal place of business at 3101 N. Federal Highway, Suite 400, Ft. Lauderdale, Florida 33306.  It has shared some of the same management, employees and locations of Madison.  Chadwick has never been registered with the Commission in any capacity. Chadwick was organized as a Florida corporation on January 12, 2000.

9.    Defendant **Qualified Leverage Providers, Inc.** is a Florida corporation with its principal place of business in Aventura, Florida.  QLP has been registered with the Commission as a futures commission merchant ("FCM") since at least December 4, 2003.

10.    Defendant **John Peter D'Onofrio** is a resident of Ft. Lauderdale, Florida. D'Onofrio is the owner of Madison and the registered agent, president, and a director of Chadwick.  D'Onofrio has been registered with the Commission as an associated person ("AP") of several IBs, but is not currently registered in any capacity.  Between 1999 and 2002, D'Onofrio was a subject of at least three National Futures Association (NFA") disciplinary

5

proceedings involving deceptive sales solicitations and failure to supervise, and paid a total of $95,000 in fines to settle those matters. In 1997, he was prohibited from transacting business as a securities agent by state actions in Wisconsin and Alabama.

11.    Defendant **Christopher Peck** is a resident of Boca Raton, Florida and has been employed by both Madison and Chadwick. Peck has been registered with the Commission as an AP of several IBs in the past and is currently registered as an AP of Mizner Financial Trading Corp., a registered IB located in Ft. Lauderdale, Florida.

12.    Defendant **Gary Baugh** is a resident of Pompano Beach, Florida. Baugh was a vice president and director of Chadwick and is currently the "managing partner" of Madison. Baugh has been registered with the Commission as an AP of several IBs, but is not currently registered in any capacity.

13.    Defendant **Lea Lauren (Nehme)** is a resident of Delray Beach, Florida and had been a sales representative with Chadwick and Madison. She has never been registered with the Commission in any capacity.

**B.    Chadwick Employees Defrauded Forex Options Customers**

14.    During the period of time of June 2003 through approximately November 2003, Chadwick traded foreign currency options ("forex options") for customers. During this time period, Chadwick salespersons solicited members of the public to open accounts to trade forex options.

15.    In solicitations using the wires, mails and other means of interstate commerce, Peck, and other employees and agents of Chadwick, knowingly or recklessly made misrepresentations and omissions to actual and potential customers that exaggerated the likelihood of profits and minimized the risk of loss from trading forex options. Peck's

6

misrepresentations generally fell into three categories, falsely telling customers: 1) that he was 99.9% positive he could make money for them trading foreign currency options; 2) that he had made a lot of money for Chadwick customers in the past and would make a lot of money for them; and 3) that Chadwick did not charge commissions unless the customer trading was profitable.

16.     Peck knew that his statements regarding trading history were false or, at a minimum, extremely reckless and had no reasonable basis to make such claims since every Chadwick customer but one, which necessarily includes any Peck solicited, closed their accounts at a loss. Specifically, Peck received daily equity runs and called at least one customer and informed him that his options were losing money.

17.     The reality was that Chadwick had at least 64 customer accounts that traded forex options, only one of these was profitable, and, in total, Chadwick customers lost approximately $960,000. No one from Chadwick ever disclosed these facts to potential or actual forex options customers.

C.      **D'Onofrio and Baugh Were Controlling Persons of Chadwick**

18.     Starting in February 2003, D'Onofrio was the president, a director and the registered agent of Chadwick. Baugh was the vice president, secretary, treasurer and a director of Chadwick. Both Baugh and D'Onofrio conducted training for the sales force of Chadwick. Baugh managed and was responsible for the daily functions of the Chadwick sales staff. He would also access customer accounts on behalf the brokers. D'Onofrio was responsible for Chadwick's overall operations. He would sit in sales meetings, hire brokers, and made staffing decisions. Baugh and D'Onofrio were controlling persons of Chadwick.

19.     D'Onofrio, as a controlling person of Chadwick, participated in the training of Chadwick's salespeople to use certain solicitation points and deterred customers from withdrawing their funds. D'Onofrio did not establish an adequate system of supervision to prevent the misrepresentations described above or did not enforce such a system.

20.     In January 2004, Baugh, as a controlling person of Chadwick, was put on notice of a potential problem when a customer complained to him that he had been charged commissions even though Peck had said that the customer would not have to pay commissions unless his account was profitable. Baugh called the customer a liar, but promised to look into it. Baugh never got back to the customer. As the head of the sales force, Baugh either failed to investigate or investigated the customer's charge, but apparently never established an adequate system of supervision to prevent such misrepresentations or did not enforce such a system.

**D.     Chadwick's Business Shifted to Forex Options Under the Name of Madison**

21.     In October 2003, D'Onofrio formed a Florida Limited Liability Company under the name of Madison. Using the same office location of Chadwick, similar management (D'Onofrio is the owner of Madison), and utilizing many of the same sales staff, in November 2003, Madison began soliciting public customers to trade forex options through QLP, a registered FCM then in Aventura, Florida. The customer agreements for the QLP over-the-counter options explain that each contract is a "bilateral agreement" between QLP and the customer as counterparties. QLP charged commissions of $245 per option, of which $230 went to Madison as the introducer. QLP also charged $390 per spread, of which $360 went to Madison. Most all of the trading decisions made by Madison customers were based on recommendations from Madison employees.

E.    **The Fraud at Madison**

22.    From December 2003 to August 2004, Madison opened a total of at least 240

accounts. Of that amount, 98% of those accounts were either closed at a loss or, as of August

2004, were valued at less than initial open equity.

23.    Madison sales representatives solicited customers by making false and

misleading statements to them. For example, regarding misleading statements that conveyed the

message that profits were likely:

      a.    Lauren told at least one customer that Madison knows what the market is
going to do before it happens and that currency trading has less risk than
investing in the stock market;

      b.    Peck told at least one customer in February 2004 he could make 30% - 40%
profit in one month, but that he had to invest funds immediately or the
customer would miss out on the profits; and

      c.    Lauren falsely told a potential Madison forex options customer that Madison
did not take commissions unless the customer made money, declaring that
"we don't make money if you don't make money."

24.    Regarding absolute guarantees that a prospective customer would make money,

examples include:

      a.    Peck told at least one customer in August 2004 that the trade he was
recommending was a "grand slam" and guaranteed to make 200%, but he had
to invest immediately or miss out on the profits; and

      b.    Peck told at least two other Madison customers, one in December 2003 and
the other in January 2004, that the trade he was recommending "could not
miss," but that the customers had to make the trade that day; and

25.    Regarding blatant false solicitations that Madison customers were actually

making money by trading through Madison, examples include:

      a.    Lauren falsely told at least one customer in November 2003 that many of her
customers were getting wealthy trading in the forex market;

b.  Peck falsely told a customer in June 2004 that two out of three trades he recommended were profitable, and that he could limit the customer's losses to 30%;

c.  Peck falsely told a customer in December 2003 that he had made a lot of money for Madison customers in the past;

d.  In February 2004, Peck told a customer that all of his customers were profitable and none had ever lost money. He falsely told another customer in August 2004 that all of his customers were making money and he had nothing to worry about; and

e.  Lauren falsely told at least one customer in the summer of 2004 that eight out of ten trades placed by Madison were profitable and that he could earn profits between 200% and 300% in two to three months.

26.   All of the solicitations set out above were false and misleading given the amount of losses actually sustained by Madison customers, and the failure to disclose the losses in the solicitations. Further, these statements were made knowingly or with reckless disregard of the truth.

27.   First, Peck, Lauren and other Madison employees knew that claims of likely profits, guarantees of profits and claims that Madison customers were actually making money were false or they were, at a minimum, reckless in making such claims based upon their own experiences as Chadwick employees. For example, customers would complain to Peck, Lauren and other Madison employees about losses in their trading account. Additionally, Peck, Lauren, and other Madison employees received daily trade tickets and/or equity runs for the Madison customers. Aware of these losses, they continued to tell customers that they could reap large profits in a short time and that Madison customers were currently making money.

28.   The Defendants lacked a reasonable basis for such statements because customers would regularly call and complain that their accounts had lost most or all of the funds deposited. Furthermore, because the sales representatives were compensated based upon the commissions

10

generated from the customer trading, they were aware that funds in customer accounts were dissipated quickly for their compensation decreased during periods of time when the firm failed to attract many new customers.  Moreover, sales representative received daily equity runs and account statements of the existing customers.

**F.      D'Onofrio And Baugh Are Controlling Persons of Madison**

29.      D'Onofrio was the sole owner and compliance officer of Madison.  D'Onofrio was responsible for ensuring that all of Madison's brokers comply with the relevant laws.  He was listed as the registered agent of the company in records of the State of Florida, is responsible for Madison's overall operations, and exercises ultimate control over Madison.

30.      D'Onofrio, as the person in charge of compliance at Madison, has not maintained an adequate system of internal supervision and control.  He has fostered or at least turned a blind eye to the fraudulent sales pitches used by the sales staff of Madison.  D'Onofrio failed to establish and implement adequate procedures that would detect and halt known fraudulent sales practices.  Further, as a former registrant and the subject of three NFA actions concerning fraudulent sales practices, he was well aware of the fraudulent nature of Chadwick's sales practices.  When Madison began its business, D'Onofrio still failed to put a compliance system or supervisory system in place that was reasonably designed to deal with the problems that had previously surfaced at Chadwick.

31.      Baugh was the managing partner at Madison and responsible for the day-to-day operations, serving as the direct supervisor of Madison's brokers.  Baugh communicated with customers regarding the status of their accounts. For example, in February 2004, Baugh talked to a customer of Madison, who had lost approximately $23,000 trading forex options through QLP. Baugh told the customer that he (Baugh) was trading puts and trading was "going very well."

Baugh asked the customer to send in more money, which he did. Baugh, at the time, knew or should have known that the trading was not going well. Such conduct evidences not only Baugh's lack of good faith, but also demonstrates the fact that he knowingly induced or participated in the scheme to defraud.

**E.**      **Agent–Principal Relationships Between QLP and Madison**

32.    On December 1, 2003, Madison entered into an exclusive introducing agreement with QLP. The agreement included the following provisions:

  (a)    Madison agreed to refer prospective customers exclusively to QLP;

  (b)    Madison agreed to assess the qualifications of the prospective customers to trade with QLP, according to standards established by QLP;

  (c)    Madison agreed to ensure, to the best of its ability, that customers had read and fully understood the QLP contract and risk disclaimers;

  (d)    Madison agreed to notify QLP, in writing, of any customer complaints, or pending or threatened action or proceeding, in respect of any matters relating to the customer's QLP account. QLP reserved for itself the exclusive right to respond, adjust or settle such complaints;

  (e)    Madison agreed to notify QLP, in writing, of the assertion of any material claim against Madison, or of the institution against Madison, of any action, investigation, or proceeding by a customer or regulatory agency, exchange, or board of trade; and

  (f)    Madison agreed to cooperate with QLP by furnishing all documents necessary to conduct an investigation and defend such claim or proceeding involving Madison.

33.    Madison directed its customers to send funds directly to QLP.

34.    QLP generated the Madison customer account statements.

35.    Madison used only account opening forms and disclosures provided by QLP.

### IV. CONCLUSIONS OF LAW

12

36.     This Court has jurisdiction over the subject matter of this action and all parties hereto pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1.

37.     Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1.

38.     Employees of Madison and Chadwick, including Peck and Lauren, knowingly, or with reckless disregard for the truth, made misrepresentations and failed to disclose material facts to customers and potential customers. Accordingly, they have engaged in the fraudulent solicitation of commodity option transactions, in violation of Section 4c(b) of the Act, 7 U.S.C.§ 6c(b), and Commission Regulation 32.9 (a) and (c), 17 C.F.R. § 32.9 (a) and (c). Under these provisions, liability for solicitation fraud involving options is established when a person or entity is found to have made misleading statements of, or omitted to disclose, material facts with scienter. *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002), *cert. denied,* 543 U.S. 1034 (2004).

39.     The fraudulent acts of Peck, Lauren and other employees of Madison and Chadwick, discussed above, occurred within the scope of their employment with Madison and Chadwick; thus, Madison and Chadwick are liable for their unlawful conduct pursuant to Section 2 (a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

40.     The fraudulent solicitations employed by Chadwick and Madison employees generally fell into distinct categories: (1) false claims that the firm had made actual profits; (2) false claims of likely profits; (3) guarantees that customers would make profits; and (4) material omissions concerning the overwhelming losses of customers. Each of these types of fraudulent solicitations are material and, if made with scienter, can constitute violations of the Act. *See CFTC v. Commonwealth Financial Group, Inc.*, 874 F. Supp. 1345, 1354-55 (S.D. Fla. Dec. 28,

1994), *vacated on other grounds*, 79 F.3d 1159 (11th Cir. Feb. 21, 1996) ("Commonwealth salespeople have also improperly failed to disclose material facts about the trading experience and past successes of themselves and Commonwealth . . . [including] Commonwealth's 80% or greater failure rate on its trading recommendations . . . and that the majority of Commonwealth customers have lost all or substantially all of the money that they invested."); *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 at 41,576 n.23 (CFTC May 12, 1994) ("When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers") *aff'd sub nom JCC v. CFTC*, 63 F.3d 1557 (11th Cir. 1995); *Levine v. Refco*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,488 at 36,115 (CFTC July 11, 1989) (profit guarantees are forbidden by the Act's anti-fraud provisions).

41.    The scienter requirement of Section 4c(b) of the Act is met when "highly unreasonable omissions or misrepresentations [are made]...that present a danger of misleading [customers] which is either known to the Defendant[s] or so obvious that Defendant[s] must have been aware of it." *R.J. Fitzgerald*, 310 F.3d at 1328 (quoting *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). Establishing *scienter* for the purpose of proving fraud requires proof that a person committed the alleged wrongful acts "intentionally or with reckless disregard for his duties under the Act." *Hammond v. Smith Barney, Harris Upham & Co., Inc.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657 (CFTC March 1, 1990).

42.    Statements of extraordinary claims of profits or profit potential made in the absence of a reasonable basis can establish "an extreme departure from the standards of ordinary care." *See In re Cascade Int'l Securities Litigation*, 840 F.Supp. 1558, 1578 (S.D. Fl. 1993)

(holding exaggerated predictions based on unverified and unsupported information was sufficient to support a finding of severe recklessness).

**A.**   **D'Onofrio and Baugh are Liable for Madison's and Chadwick's Violations as Controlling Persons**

43.    A defendant who possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an entity may be liable as a controlling person of that entity under Section 13(b) of the Act, 7 U.S.C. § 13c(b), provided that the defendant either knowingly induces, directly or indirectly, the violative acts or fails to act in good faith. *Monieson v. CFTC*, 996 F.2d 852, 858 (7th Cir. 1993); *Fitzgerald*, 310 F.3d at 1334.   To establish liability under Section 13(b), the Division must show both (1) control and (2) lack of good faith or knowing inducement of the acts constituting the violation. *In re First National Trading Corp.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶26,142, 41,787 (July 20, 1994), *aff'd without opinion sub nom. CFTC v. Pick, 39 F.3d 1139* (6th Cir. 1996).

44.    D'Onofrio and Baugh each directly or indirectly, controlled Madison and Chadwick and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Chadwick and Madison described above, and thereby each is liable for Chadwick's and Madison's violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.9 (a) and (c),  17 C.F.R. § 32.9 (a) and (c), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

**B.**   **QLP is Liable for Madison's Violations Pursuant to Agency Theory**

45.    By the conduct described above in Section III, QLP is a principal for the violations by Madison, who acted as QLP's agent in referring or soliciting customers and orders on its behalf.  Madison engaged in the illegal conduct alleged above, within the scope of its office as an agent of QLP.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) and

Commission Regulation 1.2, 17 C.F.R. § 1.2, QLP is liable for Madison's violations of Section

4c(b) of the Act, 7 U.S.C. § 6c(b), and Commission Regulation 32.9 (a) and (c), 17 C.F.R. § 32.9

(a) and (c).

### V. ORDER FOR PERMANENT INJUNCTION

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

    46.    Each of the Settling Defendants are permanently restrained, enjoined and

prohibited from directly or indirectly:

    a.    Cheating or defrauding or attempting to cheat or defraud any other person, or deceiving or attempting to deceive any other person by any means whatsoever in connection with an offer to enter into, the entry of or confirmation of the execution of, any commodity option contract, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2002) and Regulation 32.9 (a) and (c), 17 C.F.R.§ 32.9 (a) and (c) (2006);

    b.    Including but not limited to, making sales solicitations to customers that:

        i. misrepresent the likelihood of profit from trading foreign currency options contracts;

        ii. omit, downplay, or misrepresent the risk of loss in trading foreign currency options contracts;

        iii. omit the actual track record of the broker or firm; and

        iv. omit D'Onofrio's prior NFA disciplinary action for making deceptive and misleading sales solicitations and using unacceptably high-pressure sales tactics; and

        v. omit any material fact necessary to make other facts disclosed not misleading.

    47.    The Settling Defendants are further permanently restrained, enjoined and

prohibited from directly or indirectly:

    a.    Engaging in, controlling or directing the trading for any commodity futures, options on commodity futures, foreign currency futures or options on foreign currencies on his own behalf or on behalf of any other person or entity, whether by power of attorney or otherwise;

b.  Introducing customers to any other person engaged in the business of trading in commodity futures, options on commodity futures, foreign currency futures or options on foreign currencies;

c.  Soliciting, accepting or placing orders, giving advice or price quotations or other information in connection with the purchase or sale of commodity futures, options on commodity futures, foreign currency futures or options of foreign currencies; for himself and others;

d.  Otherwise engaging in any business activities related to commodity futures, options on commodity futures, foreign currency futures or options on foreign currencies;

e.  Applying for registration or claiming exemption from registration with the Commission in any capacity, engaging in any activity requiring such registration or exemption from registration, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2006), or acting, directly or indirectly, as a principal, agent, or any other officer, or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2006). This includes, but is not limited to, soliciting, accepting or receiving funds, revenue or other property from any person, giving commodity trading advice for compensation, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2006), or soliciting prospective customers, related to the purchase or sale of any commodity futures, options on commodity futures, foreign currency futures or options on foreign currencies.

48.  The injunctive provisions of this Consent Order shall be binding upon the Settling Defendants and any person who is acting in the capacity of officer, agent, employee, servant, or attorney of one or more of the Settling Defendants, any person acting in active concert or participation with one or more of the Settling Defendants, and any person who receives actual notice of this Consent Order by personal service or otherwise.

## VI. RESTITUTION AND CIVIL MONETARY PENALTIES

### ORDER FOR RESITITUTION, CIVIL MONETARY PENALTY, AND OTHER ANCILLARY RELIEF

**IT IS HEREBY ORDERED** that Settling Defendants shall comply fully with the following terms, conditions and obligations relating to the payment of restitution and civil monetary penalty.

**A.    Restitution**

49.    Subject to the paragraphs below, Settling Defendants are Ordered to make restitution to customers identified in Appendix A to this Consent Order (filed separately under seal) in the total amount of approximately $4,559,000 (the "Restitution Total"). All Settling Defendants are jointly and severally liable for payment of the Restitution Total to customers in the amount listed below for that person or entity:

|   |   |   |
|---|---|---|
| a. | Madison Forex International, LLC | $3,600,000 |
| b. | Chadwick Grayson Bauer & Co, Inc. | $959,000 |
| c. | Qualified Leverage Providers, Inc. | $3,600,000 |
| d. | John D'Onofrio | $1,400,000 |
| e. | Gary Baugh | $1,400,000 |
| f. | Christopher Peck | $550,000 |
| g. | Lea Lauren | $208,000 |

All restitution amounts are immediately due and owing upon the date this Consent Order is entered.

50.    Settling Defendants shall pay pre-judgment interest on the above amounts from October 1, 2002 to the date this Consent Order is entered. The pre-judgment interest amount shall be determined by using the underpayment rate established quarterly by Internal Revenue Service pursuant to 26 U.S.C. § 6621(a)(2).

18

51.     Settling Defendants also shall pay post-judgment interest on the above amounts. Post-judgment interest shall accrue beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of this Consent Order is entered, pursuant to 28 U.S.C. § 1961(a). Each Settling Defendant shall pay post-judgment interest from the date this Consent Order is entered until the date full payment of their respective restitution obligation is made. The amount of restitution represents the amount of funds that certain persons solicited by Settling Defendants lost trading as a result of the conduct alleged in the Complaint. Those persons are identified in Exhibit A, which includes the total amount owed to each customer. Omission of any investor from Exhibit A shall in no way limit the ability of such customer from seeking recovery from Settling Defendants or any other person or entity. Further, the amounts payable to each customer identified in Exhibit A shall not limit the ability of any customer from proving that a greater amount is owed from Settling Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

52.     Appointment of Monitor:  To effect payment by Settling Defendants and distribution of restitution to defrauded customers, the Court appoints Daniel Driscoll, Executive Vice-President of the National Futures Association ("NFA") or his successor, as Monitor ("Monitor"). The Monitor shall collect restitution payments from Settling Defendants; compute pro rata allocations to injured customers identified in Attachment A to this Consent Order, and make distributions as set forth below. Because the Monitor is not being specially compensated for these services, and these services are outside the normal duties of the Monitor, he shall not be liable for any action or inaction arising from his appointment as Monitor, other than actions involving fraud.

19

53.     Restitution payments under the Consent Order shall be made in the name "Madison Forex International Settlement Fund" and sent by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to Daniel Driscoll, Monitor, National Futures Association, 200 W. Madison Street #1600, Chicago, Illinois 60606-3447 under cover letter that identifies the Settling Defendant(s) and the name and docket number of the proceeding.  Settling Defendants shall simultaneously transmit a copy of the cover letter and the form of payment to Gregory Mocek, Director, Division of Enforcement, Commodity Futures Trading Commission, at the following address:  Three Lafayette Centre, 1152 21st Street, N.W., Washington, D.C. 20581.  The NFA shall oversee Settling Defendants' restitution obligation, shall make periodic distribution of funds to customers as appropriate, or may defer distribution until such time as it deems appropriate.  Restitution payments shall be made in an equitable fashion as determined by the NFA to the persons identified on Exhibit A.

54.     Settling Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution wherever located, in order to make partial or total payment toward their respective restitution obligation.

55.     Any acceptance by the Commission or the Monitor of partial payment of any Settling Defendant's restitution and/or civil monetary obligations shall not be deemed a waiver of Settling Defendants' obligation to make further payments pursuant to the Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balances.

56.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each of the customers identified in Exhibit A are explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution amount which has not been paid by Settling Defendants, to ensure

20

continued compliance with any provision of this Consent Order and to hold Settling Defendants for any violations of any provisions of this Consent Order. Any individual or entity holding frozen funds by this Court's Statutory Restraining Order entered June 9, 2005, shall transfer those funds to the NFA to be distributed, pro rata, to the defrauded customers pursuant to the Restitution provision set forth above.

57.     Settling Defendants shall immediately notify the Commission and Monitor if they make any agreement with any customer obligating them to make payments outside of this Consent Order. Settling Defendants shall provide immediate evidence to the Court, the Commission and Monitor of any payments made pursuant to such agreement. Upon being notified of any payments made by Settling Defendants to customers outside of this Consent Order, and receiving evidence of such payments, the Monitor will have the right to reduce and offset Settling Defendants' obligation to specified investors and to make any changes in the restitution distribution schedule that he deems appropriate.

**B.     Civil Monetary Penalty**

58.     The following Civil Monetary Penalties ("CMP") are assessed by the Court:

|   |   |   |
|---|---|---|
| a. | Madison Forex International, LLC | $2,100,000 |
| b. | Chadwick Grayson Bauer & Co, Inc. | $610,000 |
| c. | Qualified Leverage Providers, Inc. | $1,400,000 |
| d. | John D'Onofrio | $435,000 |
| e. | Gary Baugh | $385,000 |
| f. | Christopher Peck | $380,000 |
| g. | Lea Lauren | $138,000 |

The CMPs are immediately due and owing upon the entry of this Order, provided that all payments made by any Settling Defendant pursuant to this Consent Order shall be applied first to

satisfy the Settling Defendant's restitution payment under this Consent Order, and upon satisfaction of such obligation, shall thereafter be applied to satisfy the Settling Defendant's CMP obligation under this Consent Order.

59. Settling Defendants also shall pay post-judgment interest on the above amounts. Post-judgment interest shall accrue beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961(a). Each Settling Defendant shall pay post-judgment interest from the date this Consent Order is entered until the date full payment of their respective civil monetary penalty obligation is made. Settling Defendants shall pay such civil monetary penalties by electronic fund transfer, or U.S. postal money order, certified check, bank cashier's check, or bank money order, and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Marie Batemen - AMZ-300
> DOT/FAA/MMAC
> 6500 S. Macarthur Blvd.
> Oklahoma City, OK 73169

If payment by electronic transfer is chosen, contact Marie Bateman at 405-954-6569 for instructions. Settling Defendants shall accompany payment of the penalty with a cover letter that identifies the Settling Defendant and the name and docket number of this proceeding. Settling Defendants shall simultaneously transmit a copy of the cover letter and the form of payment to:

> Office of Cooperative Enforcement
> Division of Enforcement
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street, NW
> Washington, DC 20581.

and

Regional Counsel
Division of Enforcement
Commodity Futures Trading Commission
525 W. Monroe, Suite 1100
Chicago, Illinois 60661

60.     The equitable relief provisions of this Consent Order shall be binding upon

Setting Defendants, and any person who is acting in the capacity of officer, agent, employee,

servant, or attorney of Defendants, and any person acting in active concert or participation with

Defendants who receives actual notice of this Consent Order by personal service or otherwise.

## VII.MISCELLANEOUS PROVISIONS

61.     **NOTIFICATION OF FINANCIAL INSTITUTIONS:**     The parties stipulate

that upon the issuance of this Order, the Commission shall promptly provide each of the

financial institutions identified by the Settling Defendants with a copy of this Consent Order.

Within thirty (30) days of receiving a copy of this Consent Order, each of the financial

institutions shall liquidate and release any and all funds held by Settling Defendants, and convey

the funds by wire transfer to an account designated by the Monitor, less any administrative or

bank wire transfer fees.  The transfer of such funds held by Settling Defendants represents an

offset to the restitution amount owed by Settling Defendants pursuant to this Consent Order.  At

no time during the release, liquidation or wire of the funds shall Settling Defendants be given

access to, or be provided with, any funds from these accounts.  Settling Defendants and the

financial institutions listed below shall cooperate fully and expeditiously with the Commission

and Monitor in the liquidation and transfer of funds.

62.     **ASSET FREEZE:**     Upon entry of this Consent Order and liquidation and

release of funds described in Section VII.A above, the restriction against transfer, dissipation,

23

and disposal of assets detailed in the Statutory Restraining Order and Consent Preliminary

Injunction shall no longer be in effect.

    63.    **NOTICES:**   All notices required to be given by any provision in this Consent

Order shall be sent certified mail, return receipt requested, as follows:

    **1.**    **Notice to Plaintiff Commission:**
Regional Counsel, Division of Enforcement
Commodity Futures Trading Commission
525 W. Monroe Street, Suite 1100
Chicago, Illinois 60661

    **2.**    **Notice to the Monitor:**
Vice President, Compliance
National Futures Association
200 West Madison Street
Chicago, Illinois 60606

    **3.**    **Notice to Defendants Madison, Chadwick, and QLP**
c/o Homer & Bonner, P.A.
1441 Brickell Avenue, 12th Floor
Miami, Florida 33131

    **4.**    **Notice to John D'Onofrio**
3430 Galt Ocean Drive, #910
Ft. Lauderdale, FL 33308

    **5.**    **Notice to Gary Baugh**
11076 Northwest 3rd Street
Coral Springs, Florida 33071

    **6.**    **Notice to Lea Lauren (Nehme)**
622 Heliconia Road
Delray Beach, Florida 33484

    **7.**    **Notice to Christopher Peck**
22557 Bluefin Trail
Boca Raton, Florida 33428

    64.    **ENTIRE AGREEMENT, AMENDMENTS AND SEVERABILITY:**   This

Consent Order incorporates all of the terms and conditions of the settlement among the parties.

Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (1) reduced to writing; (2) signed by all parties, and (3) approved by Order of Court. If any provision of this Consent Order or the application on any provisions or circumstances is held invalid, the remainder of this Consent Order shall not be affected by the holding.

65.  **WAIVER:**   The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

66.  **COUNTERPARTS:** This Consent Order may be executed by the parties in counterparts and by facsimile.

67.  **AUTHORITY:**   D'Onofrio warrants that he is a corporate representative of Chadwick, that this Consent Order has been duly authorized by Chadwick, and that he has been duly empowered to sign and submit it on behalf of Chadwick. Baugh warrants that he is a corporate representative of Madison, that this Consent Order has been duly authorized by Madison, and that he has been duly empowered to sign and submit it on behalf of Madison. Andrew Stern warrants that he is a corporate representative of QLP, that this Consent Order has been duly authorized by QLP, and that he has been duly empowered to sign and submit it on behalf of QLP.

68.  **JURISDICTION:**   This Court shall retain jurisdiction of this cause to assure compliance with this Consent Order and for other purposes related to this action.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order.

**DONE AND CONSENT ORDERED** in Miami, Florida, this _____/2_____ day of _____July_____, 2007.


_____
**CECILIA M. ALTONAGA**
UNITED STATES DISTRICT JUDGE


CONSENTED TO AND APPROVED BY:

Dated: _1/11/07_____

_____
John P. D'Onofrio, on behalf of Chadwick,
Grayson, Bauer & Co., Inc.

Dated: _1/11/07_____

_____
Andrew Steven Stern (Principal) on behalf of
Qualified Leverage Providers, Inc.

Dated: _1/11/07_____

_____
Gary Baugh, on behalf of Madison Forex
International, LLC

Dated: _1/11/07_____

_____
Christopher King
Attorneys for Settling Defendants
Homer & Bonner
The Four Seasons Tower
1441 Brickell Avenue, Suite 1200
Miami, Florida 33131
305-350-5100 (Telephone)
305-982-0060 (Facsimile)


26

Dated: _1/11/07_

_[signature]_

Jennifer S. Diamond
Attorney for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0535